1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   KATHLEEN J. SANCHEZ,          ) Case No. EDCV 14-2204-JPR
                                    )
12                 Plaintiff,       )
                                    ) **MEMORANDUM OPINION AND ORDER**
13            v.                    ) **AFFIRMING COMMISSIONER**
                                    )
14   CAROLYN W. COLVIN, Acting      )
     Commissioner of Social         )
15   Security,                      )
                                    )
16                 Defendant.       )
                                    )
17   _____

18   **I.    PROCEEDINGS**

19        Plaintiff seeks review of the Commissioner's final decision

20   denying her application for Social Security disability insurance

21   benefits ("DIB").  The matter is before the Court on the parties'

22   Joint Stipulation, filed August 13, 2015, which the Court has

23   taken under submission without oral argument.  For the reasons

24   stated below, the Commissioner's decision is affirmed.

25   **II.   BACKGROUND**

26        Plaintiff was born in 1967.  (Administrative Record ("AR")

27   387.)  She completed one year of college and worked as a cashier,

28   merchandiser, administrative assistant, and teacher's aide.  (AR

                                    1

421, 442.)

On April 29, 2010, Plaintiff submitted an application for DIB, alleging that she had been unable to work since April 27, 2009, because of bulging discs in her back and neck, degenerative disc disease, arthritis in her back, a "pinched nerve," fibromyalgia, depression, and "mitral valve prolapse." (AR 387, 441-42.)  After her application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 85, 152.)  After postponements to allow Plaintiff to obtain a representative (AR 25-26, 29-30, 85), a hearing was held on January 26, 2012, at which Plaintiff, who was represented by counsel, appeared, as did a vocational expert and a medical expert.  (AR 31-53.)  In a written decision issued April 4, 2012, the ALJ found Plaintiff not disabled.  (AR 85-97.)

On June 7, 2013, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded for resolution of certain enumerated issues.  (AR 105-08.)  On February 4, 2014, a second hearing was held, at which Plaintiff, who was represented by an attorney, and a different VE and ME testified.  (AR 54-79.)  In a written decision issued April 8, 2014, the ALJ again found Plaintiff not disabled.  (AR 113-29.)  On August 28, 2014, the Appeals Council denied Plaintiff's request for review.  (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.

2

See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra
v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial
evidence means such evidence as a reasonable person might accept
as adequate to support a conclusion.  Richardson, 402 U.S. at
401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1996).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§ 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th
Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the

Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

1    If that happens or if the claimant has no past relevant

2  work, the Commissioner then bears the burden of establishing that

3  the claimant is not disabled because she can perform other

4  substantial gainful work available in the national economy.

5  § 404.1520(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.  That

6  determination comprises the fifth and final step in the

7  sequential analysis.  § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828

8  n.5; <u>Drouin</u>, 966 F.2d at 1257.

9    B.  <u>The ALJ's Application of the Five-Step Process</u>

10    At step one, the ALJ found that Plaintiff had not engaged in

11  substantial gainful activity since April 27, 2009, her alleged

12  onset date.  (AR 116.)  At step two, he concluded that Plaintiff

13  had the severe impairments of cervical and lumbar disc disease,

14  migraine headaches, fibromyalgia, chronic pain syndrome,

15  depression, anxiety, and "bereavement/post-traumatic stress

16  disorder."  (<u>Id.</u>)  He found that Plaintiff's gastritis,

17  gastroesophageal reflux disease, irritable bowel syndrome, and

18  hemorrhoids were not severe (<u>id.</u>), findings Plaintiff does not

19  challenge.  At step three, the ALJ determined that Plaintiff's

20  impairments did not meet or equal a listing.  (AR 116-19.)  At

21  step four, he found that Plaintiff had the RFC to perform

22  sedentary work[2] except

23    occasionally lift and carry 10 [pounds], frequently lift

24

25    [2] "Sedentary work involves lifting no more than 10 pounds at
26  a time and occasionally lifting or carrying articles like docket
   files, ledgers, and small tools." § 404.1567.  "Although a
27  sedentary job is defined as one which involves sitting, a certain
   amount of walking and standing is often necessary in carrying out
28  job duties." <u>Id.</u>

and carry less [than] 10; stand and walk (with normal breaks) for a total of 2 of 8-hour day; sit (with normal breaks) for a total of 6 of 8-hour day; no use of upper extremity above shoulder level bilaterally; no use of the lower extremities for foot pedals bilaterally; postural limitations all occasional, no climbing ladders, ropes, scaffolds, crawling, heights, or dangerous moving machinery; avoid extremes of temperatures heat and cold; and simple tasks, object oriented, so no working with general public.

(AR 119.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could not perform her past relevant work.  (AR 127.) At step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy.  (AR 127-28.)  Accordingly, he found her not disabled.  (AR 129.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ erred in assessing (1) two treating physicians' opinions, (2) a treating psychologist's opinion, (3) her subjective complaints, and (4) the VE's testimony, specifically, whether it conflicted with the Dictionary of Occupational Titles.  (J. Stip. at 6.)  The Court addresses these issues in an order different from that followed by the parties.

A.   The ALJ Properly Assessed Plaintiff's Credibility

In issue three, Plaintiff contends that the ALJ failed to provide clear and convincing reasons for discounting her credibility.  (J. Stip. at 39-44.)  For the reasons discussed below, the ALJ did not err.

1          1.   <u>Applicable law</u>

2          An ALJ's assessment of symptom severity and claimant

3    credibility is entitled to "great weight."  <u>See</u> <u>Weetman v.</u>

4    <u>Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); <u>Nyman v.</u>

5    <u>Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24,

6    1986).  "[T]he ALJ is not 'required to believe every allegation

7    of disabling pain, or else disability benefits would be available

8    for the asking, a result plainly contrary to 42 U.S.C.

9    § 423(d)(5)(A).'"  <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th

10   Cir. 2012) (quoting <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir.

11   1989)).

12         In evaluating a claimant's subjective symptom testimony, the

13   ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d

14   at 1035-36.  "First, the ALJ must determine whether the claimant

15   has presented objective medical evidence of an underlying

16   impairment '[that] could reasonably be expected to produce the

17   pain or other symptoms alleged.'"  <u>Id.</u> at 1036 (quoting <u>Bunnell</u>

18   <u>v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  If

19   such objective medical evidence exists, the ALJ may not reject a

20   claimant's testimony "simply because there is no showing that the

21   impairment can reasonably produce the <u>degree</u> of symptom alleged."

22   <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in

23   original).

24         If the claimant meets the first test, the ALJ may discredit

25   the claimant's subjective symptom testimony only if he makes

26   specific findings that support the conclusion.  <u>See</u> <u>Berry v.</u>

27   <u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

28   affirmative evidence of malingering, the ALJ must provide "clear

7

and convincing" reasons for rejecting the claimant's testimony.[3]
<u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 492-93 (9th Cir. 2015) (as
amended); <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1163 & n.9 (9th Cir.
2014).  The ALJ may consider, among other factors, (1) ordinary
techniques of credibility evaluation, such as the claimant's
reputation for lying, prior inconsistent statements, and other
testimony by the claimant that appears less than candid; (2)
unexplained or inadequately explained failure to seek treatment
or to follow a prescribed course of treatment; (3) the claimant's
daily activities; (4) the claimant's work record; and (5)
testimony from physicians and third parties.  <u>Rounds v. Comm'r
Soc. Sec. Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as
amended); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir.
2002).  If the ALJ's credibility finding is supported by
substantial evidence in the record, the reviewing court "may not
engage in second-guessing."  <u>Thomas</u>, 278 F.3d at 959.

## 2.  <u>Relevant background</u>

In a July 2010 function report, Plaintiff wrote that she had
pain in her neck, back, and legs; fatigue; headaches; and
shortness of breath.  (AR 452.)  She had trouble falling and
staying asleep and had back spasms if she lay down too long.  (AR
453.)  She could walk for 10 or 15 minutes before having to rest
for 10 minutes.  (AR 457.)  Plaintiff had difficulty walking long
distances, climbing "a lot of stairs," squatting, bending,

---

[3] The Commissioner objects to the clear-and-convincing
standard but acknowledges that her argument was rejected — again
— in <u>Burrell v. Colvin</u>, 775 F.3d 1133, 1136-37 (9th Cir. 2014).
(J. Stip. at 45-46 n.11); <u>see also</u> <u>Brown-Hunter v. Colvin</u>, 806
F.3d 487, 493 (9th Cir. 2015) (as amended) (reaffirming <u>Burrell</u>).

standing for long periods, reaching, and kneeling.  (AR 456-57.)
She had "difficulty sitting for long periods due to pain in [her]
back" and would "lie down most of the time."  (AR 456.)

Plaintiff wrote that she lived with her four- and eight-
year-old sons and seven-year-old grandson.  (AR 452.)  She cared
for her children and grandchild, prepared their meals, did their
laundry, and supervised them.  (Id.)  She prepared simple meals
every day; did laundry once a week, when she was having a "good
day"; did the dishes for 15 minutes each day; and vacuumed in
"short intervals" when she was "feeling good."  (AR 453-54.)  She
drove only short distances because of pain and fatigue.  (AR
454.)  She shopped in stores once a week for 30 to 45 minutes.
(AR 454-55.)  She talked on the phone daily to friends and family
and attended church once or twice a month.  (AR 455.)  Her daily
activities included showering, helping the kids pick out their
clothes, lying down to watch a movie or watch the children play,
taking a hot bath, taking medication, watching television,
reading, and listening to the radio.  (AR 452, 455.)

In an undated "Disability Report – Appeal," Plaintiff wrote
that she had neck, leg, and back pain; numbness in her legs,
arms, and hands; fatigue; shortness of breath; and back spasms.
(AR 464.)  She had headaches two or three times a week.  (Id.)
She had difficulty lifting heavy objects, walking long distances,
standing for very long, bending, reaching, and sitting for long
periods.  (AR 464-65.)  She had trouble kneeling for long periods
"due to numbness in my legs."  (AR 465.)

At the January 2012 hearing, Plaintiff testified that she
couldn't work because of headaches; neck pain; numbness of her

hands, arms, and legs; and back pain and spasms.  (AR 39-40, 42-43.)  She had to lie down six hours out of an eight-hour day.  (AR 40.)  Plaintiff testified that every morning she got up, got her five- and ten-year-old sons and eight-year-old grandson ready for school, made them breakfast, and walked them to school, which was about a quarter of a mile and a 10-minute walk away.  (AR 41, 43, 45.)  When she returned from the school, she would lie down for a little while, take a shower, and then pick up her younger son from kindergarten.  (AR 41.)  Her 28-year-old daughter would pick up the older boys from school.  (AR 43-44.)  Plaintiff was able to drive short distances.  (AR 42.)  She went grocery shopping with her daughter once a week; she was sometimes able to walk through the store but sometimes used the store's electric carts.  (AR 44-45.)  Plaintiff testified that she was unable to get out of bed two days a week.  (AR 48.)

At the February 2014 hearing, Plaintiff testified that she had a dull pain in her back and arms; numbness and tingling in her lower arms, legs, and feet "multiple times during the day"; a burning feeling in her neck; achiness; trouble sleeping; and migraines that lasted 24 hours once or twice a week.  (AR 61-63, 68-69.)  She had back spasms if she sat or stood too long, and she was "constantly exhausted."  (AR 64-65.)  Plaintiff spent more than eight hours a day lying down (AR 63) and she had three or four "bad days" a week, during which she "c[ould]n't even walk" (AR 70).  She had trouble with short-term memory and concentrating.  (AR 72-73.)

Plaintiff testified that she could lift a gallon of milk but nothing heavier.  (AR 64.)  She could sit for 30 to 45 minutes

before she would feel her back pain "getting worse," and the
maximum amount of time she could sit was an hour, after which she
would have to walk for 10 to 15 minutes.  (AR 66-67.)  She could
stand for 30 to 45 minutes.  (AR 67.)

Plaintiff testified that each morning she walked her boys to
school, which was about a half mile and a 20- to 25-minute walk
away.  (AR 64.)  Once at the school, she would sit for 20 to 30
minutes before walking home.  (AR 67-68.)  She picked the boys up
from school (AR 72), went grocery shopping and to the doctor, and
once a month went to a family member's house (AR 65).  She did
laundry with help from her husband and daughter and sometimes
washed dishes.  (AR 71.)

3.   Analysis

The ALJ credited some of Plaintiff's subjective complaints,
finding that it "is uncontradicted that [she] is not capable of
performing a full workweek on a regular and continuous basis
without limitation."  (AR 120.)  Thus, based on Plaintiff's
statements that she "has difficulty with sustained weight-bearing
activities (standing and walking)," the ALJ limited her to
sedentary work "because this is the only exertional level that
allows for more sitting than standing and walking."  (Id.)  The
ALJ also limited Plaintiff to lifting "objects weighing no more
than 10 pounds, which was also within her stated capacity."
(Id.)  To the extent the ALJ discounted Plaintiff's subjective
complaints (id. (stating that Plaintiff's statements concerning
her symptoms were "not entirely credible"), he provided clear and
convincing reasons for doing so.

The ALJ permissibly discounted Plaintiff's subjective

complaints because her daily activities were inconsistent with
her allegedly totally disabling impairments.  Plaintiff claimed
that she had to lie down most of the day, could not get out of
bed two days a week, and had three or four bad days a week,
during which she couldn't walk.  (AR 40, 63, 70.)  But as the ALJ
noted (AR 126), Plaintiff had a regular morning routine that
included waking her young children and grandson, getting them
ready for school, making them breakfast, walking them to school,
and picking them up (AR 41-43, 45, 64, 72).  She also supervised
the children, including her autistic grandson (AR 1019 (Dr.
Timothy L. Sams noting that Plaintiff's "[d]aughter's son is
autistic and pt cares for him")), prepared their meals, and did
their laundry with help.  (AR 452, 455.)  Plaintiff shopped in
stores once a week, went to doctor's appointments, did some light
chores, attended church once or twice a month, and visited
friends or family about once a month.  (AR 44-45, 65, 71, 454-
55.)  She also attended school in the spring of 2013, and after
her classes ended, she told her psychologist that she wanted to
return to school in the fall.  (AR 1035 (February 8, 2013, Dr. Le
noting that Plaintiff "has gone back to school and is currently
taking a typing course"), 1016 (June 20, 2013, Dr. Sams noting
that Plaintiff "wants to go to school in mornings beginning in
the fall"), 1026 (June 21, 2013, Dr. Le noting that Plaintiff's
"classes have ended").)  As such, the ALJ properly discounted
Plaintiff's credibility because her daily activities were
inconsistent with her allegedly debilitating symptoms.  See
Molina, 674 F.3d at 1112 (ALJ may discredit claimant's testimony
when "claimant engages in daily activities inconsistent with the

alleged symptoms" (citing <u>Lingenfelter</u>, 504 F.3d at 1040)); <u>see also</u> <u>Mitchell v. Colvin</u>, 584 F. App'x 309, 311 (9th Cir. 2014) (upholding finding that claimant's allegations of disabling impairments were inconsistent with daily activities that included caring for children, driving, shopping, and riding bicycle); <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ properly discounted claimant's testimony because "she leads an active lifestyle, including cleaning, cooking, walking her dogs, and driving to appointments").

The ALJ also found that Plaintiff's ability to be the caretaker for her children and grandchild "shows she is able to perform duties akin to at least sedentary work." (AR 127; <u>see also</u> AR 123 (noting that Plaintiff's "statements that she does activities daily, like walk her children to school, shows she is able to get out daily and perform routine activities on a set schedule").) Indeed, as previously discussed, Plaintiff woke the children each morning, got them ready for school, made them meals, did their laundry, and supervised them. She also walked to their school and back twice a day, and she reported to her treating psychologist, Dr. Sams, in January 2014 that she "spends 4/16 waking hours on her feet" (AR 1059) – which is consistent with her RFC for standing and walking for a total of two hours in an eight-hour day (AR 119).

The ALJ was entitled to discount Plaintiff's credibility because her daily activities indicate that she had capacities that are transferrable to a work setting. See <u>Molina</u>, 674 F.3d at 1113 (ALJ may discredit claimant's testimony when claimant "reports participation in everyday activities indicating

13

capacities that are transferable to a work setting"); <u>Morgan v.
Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999)
(finding that ALJ permissibly discounted plaintiff's credibility
because his "ability to fix meals, do laundry, work in the yard,
and occasionally care for his friend's child served as evidence
of [his] ability to work").)

     The ALJ also permissibly discounted Plaintiff's subjective
complaints because the objective medical evidence did not support
them.  The ALJ noted that Plaintiff claimed to "suffer[] from
significant degeneration in her spine with pinched nerves that
caused radiculopathy in her upper and lower extremities" (AR 126;
<u>see</u> AR 38 (alleging numbness in arms, hands, legs, and feet that
"makes it hard for me to walk"), 43 (alleging she couldn't "sit
through an eight hour day" because of "numbness"), 68 (alleging
numbness in hands, lower arms, legs, and feet), 441 (alleging
that "bulging discs in back and neck," "degenerative disc
disease," and "pinched nerve" limited ability to work)), but her
medical records showed "minimal" evidence of loss of motor
strength, loss of sensation, or unequal reflexes (AR 126).
Indeed, Plaintiff's doctors consistently noted that she had
intact cranial nerves, no muscle weakness, intact sensation, and
normal reflexes and gait.  (<u>See, e.g.</u>, 586, 720, 756, 789, 795,
879, 996-97, 1021, 1024, 1027, 1030, 1033, 1036, 1039, 1042,
1045, 1048, 1051, 1054, 1075-76, 1091; <u>but see</u> AR 714 (Dr. Lew
Disney noting that Plaintiff's motor strength was 5/5 but
sensation decreased on left compared to right), 801 (Dr. Melissa
D. Moseberry noting antalgic gait but normal reflexes, motor
strength, sensation, and heel and toe walking), 1069-70 (Dr.

Sudhir K. Reddy noting intact cranial nerves and normal reflexes but "[s]eems to have some reduced [sensation to] pin prick L5-S1").)   Moreover, electromyograms and nerve-conduction studies of her upper and lower extremities were normal.   (AR 714, 718, 764, 900, 1042.)   The ALJ was entitled to consider the lack of objective medical evidence in assessing Plaintiff's complaints of pain and her credibility.   See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence").

Plaintiff argues that she consistently reported her symptoms of back pain, abnormal sensation, joint pain, muscle weakness, and fatigue to her doctors and that her symptoms "are not less credible in the event they are ultimately found to be more attributable to her fibromyalgia than to her degenerative disc disease."   (J. Stip. at 40-41.)   But even if Plaintiff now asserts that her symptoms are attributable to fibromyalgia rather than her back condition, that does not change the fact that upon examination her doctors consistently found that she had normal muscle strength, reflexes, and sensation, contrary to her own reports.   As such, the ALJ did not err.

The ALJ was also permitted to rely on Plaintiff's treatment

1   history in discounting her subjective complaints.  The ALJ found

2   that Plaintiff's "mental health treatment is spotty in spite of

3   her statements that she has daily or weekly problems with

4   symptoms of depression, grief, and PTSD." (AR 126.)  The ALJ

5   noted that Plaintiff received only brief mental-health treatment

6   following the death of one of her sons in 2007, and other than

7   her counseling with Dr. Sams, which began in January 2012, "there

8   is little in the way of continuous psychiatric treatment,

9   including medications and counseling." (Id.)  Indeed, although

10  Plaintiff claims to have been disabled since April 2009 in part

11  because of her mental-health problems, she sought treatment only

12  briefly in 2007 and the fall of 2009 (see AR 555-58 (psychologist

13  Garmen's treatment notes from grief counseling sessions in August

14  and October 2009), 800-01 (Dr. Moseberry's Sept. 2009 note

15  stating she had prescribed Effexor for depression)), and then not

16  again until more than two years later, in January 2012. (AR

17  952.)  Plaintiff's two-year gap in treatment was a clear and

18  convincing reason for discounting her subjective complaints.  See

19  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ

20  may discount claimant's testimony in light of "unexplained or

21  inadequately explained failure to seek treatment or to follow a

22  prescribed course of treatment"); SSR 96-7p, 1996 WL 374186, at

23  *7 (claimant's statements "may be less credible if the level or

24  frequency of treatment is inconsistent with the level of

25  complaints").

26      Plaintiff argues that her lack of mental-health treatment

27  was not a valid reason for discounting her credibility because

28  "'it is a questionable practice to chastise one with a mental

16

impairment for the exercise of poor judgement in seeking
rehabilitation.'" (J. Stip. at 43 (quoting <u>Regennitter v. Comm'r</u>
<u>of Soc. Sec. Admin.</u>, 166 F.3d 1294, 1299 (9th Cir. 1999)).)  But
nothing indicates that Plaintiff's failure to seek treatment was
a result of her mental impairments.  <u>See</u> <u>Molina</u>, 674 F.3d at
1113-14 (ALJ permissibly discounted credibility based on failure
to seek psychiatric care for anxiety disorder when "no medical
evidence" showed that claimant's resistence to treatment "was
attributable to her mental impairment rather than her own
personal preference").  Indeed, she had previously sought mental-
health treatment and consistently attended appointments with her
many other medical providers, indicating that she was capable of
seeking treatment when she so desired.  As such, the ALJ did not
err in relying on this factor.

The ALJ also observed that Plaintiff's work history "both
bolsters and affects her credibility." (AR 126.)  He noted that
Plaintiff continued to work for two years after the death of her
son, the event that triggered her depression and PTSD, but that
"the lack of continued earnings generally supports her
allegations." (<u>Id.</u>)  As such, it does not appear that the ALJ
relied on this factor to discount Plaintiff's credibility.  But
even if the ALJ relied on this factor and erred in doing so, it
was harmless because he gave other, clear and convincing reasons
for discounting Plaintiff's subjective-symptom testimony.  <u>See</u>
<u>Carmickle</u>, 533 F.3d at 1162-63 (finding error harmless when ALJ
cited other reasons to support credibility determination).

Reversal is not warranted on this ground.

B.   <u>The ALJ Properly Assessed the Medical Opinions</u>

In issues one and two, Plaintiff contends that the ALJ erred in assessing the opinions of three treating medical sources: pain-management physician Philip Chiou, rheumatologist Thang T. Le, and psychologist Sams.  (J. Stip. at 7-18, 30-35.)  For the reasons discussed below, remand is not warranted.

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen</u>, 80 F.3d at 1285.  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  § 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  § 404.1527(c)(2)-(6).

When a treating or examining physician's opinion is not

18

contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957; accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

### 2.   Physical Impairments

#### a.   *Relevant background*

Dr. Chiou, who specialized in pain management, first saw Plaintiff on September 13, 2011 (AR 754-58), and for follow-up appointments on October 6 and December 21 (AR 932-33, 938-39). On December 1, 2011, he conducted an EMG and NCS, which were normal (AR 934), and on December 29, he administered four trigger-point injections (AR 940). In a letter dated December 21, 2011, Dr. Chiou stated that after seeing Plaintiff five times and performing diagnostic studies, he believed she had fibromyalgia. (AR 930.) Dr. Chiou stated that "[c]linical studies" of people with low-back pain show that "of those who have been out of work for 2 years, extremely few will ever return to work." (Id.) He opined that such data "can be extrapolated and applied to the fibromyalgia population" and that Plaintiff would thus "likely be permanently disabled from a work perspective." (Id.)

On January 3, 2011, Dr. Chiou completed a Fibromyalgia

Impairment Questionnaire.  (AR 942-47.)  He wrote that Plaintiff
met the American Rheumatological criteria for fibromyalgia, and
her other diagnoses included lumbalgia, lumbar facet arthropathy,
lumbar radiculitis, degenerative disc disease, cervicalgia, and
cervical disc herniation.  (Id.)  He listed her positive clinical
findings as tenderness to palpation in 11 of 18 tender points.[4]
(Id.)  Under the section for identifying test results supporting
his diagnosis, Dr. Chiou wrote that "[f]ibromyalgia is a
diagnosis of exclusion" and listed several normal test findings.
(AR 943.)  He listed her primary symptoms as numbness in the legs
and hands, diffuse body pain, low-back pain, and neck pain, and
he stated that her pain was an 8 on a scale of 10.  (AR 943-44.)
Dr. Chiou listed several medications Plaintiff had taken and
their side effects.  (AR 944.)

     Dr. Chiou opined that Plaintiff could sit "0-1" hour in an
eight-hour day, stand for up to a half hour at a time for a total
of "0-1" hour in an eight-hour day, lift five pounds frequently
and 10 pounds occasionally, and carry up to 10 pounds
occasionally.  (AR 945.)  She needed to get up and move around

---

[4] Trigger points, or tender points, "are pain points or
localized areas of tenderness around joints, but not the joints
themselves," that "hurt when pressed with a finger."
Fibromyalgia Tender Points, WebMD, http://www.webmd.com/
fibromyalgia/guide/fibromyalgia-tender-points-trigger-points
(last updated May 24, 2014).  In the past, a fibromyalgia
diagnosis was based on whether a person had pain when tender
points were pressed firmly, but "[n]ewer guidelines don't require
a tender point exam"; "[i]nstead, a fibromyalgia diagnosis can be
made if a person has had widespread pain for more than three
months — with no underlying medical condition that could cause
the pain."  Fibromyalgia, Mayo Clinic, http://www.mayoclinic.org/
diseases-conditions/fibromyalgia/basics/tests-diagnosis/
con-20019243 (last updated Oct. 1, 2015).

every hour and could not sit again for another three to four
hours, and she would take more than 10 unscheduled breaks each
day.  (AR 945-46.)  Plaintiff was incapable of even low-stress
jobs, and emotional factors contributed to the severity of her
symptoms and functional limitations.  (Id.)  She would be absent
from work more than three times a month because of her
impairments or treatment.  (AR 946.)  She could not push, pull,
bend, or stoop.  (AR 946-47.)

Dr. Chiou opined that "[g]iven [that] the patient has been
unable to work for an extended period of time," she likely had a
"chronic disability."  (AR 942.)  In the space for listing the
"earliest date that the description of symptoms and limitations"
applied, Dr. Chiou wrote "per patient report July 2009."  (AR
947.)

Dr. Le, a rheumatologist, first saw Plaintiff on October 6,
2011.  (AR 718-21.)  He diagnosed fibromyalgia, "[s]everely
symptomatic"; cervical and lumbar spondylosis; and fatigue.  (AR
721.)  On October 25, 2011, he saw her for a follow-up
appointment.  (AR 788-90.)  On October 27, 2011, he wrote a
letter stating that Plaintiff

recently came under my medial care for severe
fibromyalgia.  This is a chronic condition that causes
severe muscle pain, stiffness, and fatigue.  Because of
these symptoms, the patient has been unable to work.
(AR 792.)  Dr. Le saw Plaintiff for follow-up appointments on
November 17, 2011 (AR 878-80), and February 17, April 10, June
13, August 24, 2012.  (AR 1044-54.)

On August 29, 2012, Dr. Le completed a Fibromyalgia

21

Impairment Questionnaire, stating that he had treated Plaintiff every month or two since October 6, 2011. (AR 957-62.) He stated that Plaintiff met the American Rheumatological criteria for fibromyalgia and listed her other diagnoses as cervical and lumbar spondylosis and fatigue. (AR 957.) Dr. Le believed that Plaintiff's prognosis was poor and stated that she "remain[ed] markedly symptomatic despite being on medical therapy." (Id.) Plaintiff's "positive clinical findings" included multiple tender points and limited range of motion of the cervical and lumbar spine, and her symptoms included muscle and joint pain, muscle weakness, "numbness and tingling of the extremities," and fatigue. (AR 957-58.) Her pain was a 9 on a scale of 10. (AR 959.) Dr. Le also listed Plaintiff's medications and side effects. (Id.)

Dr. Le opined that Plaintiff could sit for four hours in an eight-hour day, stand and walk for "0-1" hour in an eight-hour day, and occasionally lift and carry 10 pounds. (AR 960.) She needed to get up and move around every 15 minutes for five minutes and take three unscheduled 10-minute breaks each eight-hour workday. (AR 906-61.) She was incapable of even low-stress jobs, and her pain and fatigue affected her concentration. (Id.) Plaintiff would be absent from work because of her impairments or treatment more than three times a month. (AR 961.) She needed to avoid temperature extremes, humidity, kneeling, and stooping. (AR 961-62.) Dr. Le believed that Plaintiff's symptoms and limitations had existed since October 6, 2011 (AR 962), which was the date he first treated her. Dr. Le thereafter saw Plaintiff for follow-up appointments on September 2 and December 10, 2012

1   (AR 1038-43), and February 8, March 7, May 10, June 21, September

2   27, and November 26, 2013 (AR 1020-37).

3      Medical expert Arnold Ostrow, who was board certified in

4   internal medicine (AR 333), reviewed Plaintiff's medical records

5   and testified at the February 4, 2014 hearing (AR 58-61).  He

6   listed Plaintiff's medically determinable impairments as cervical

7   discogenic disease, lumbosacral discogenic disease, migraine

8   headaches, fibromyalgia, and chronic pain syndrome.  (AR 59.)  He

9   believe Plaintiff was limited to lifting 20 pounds occasionally

10   and 10 pounds repetitively, standing and walking six hours, and

11   sitting six hours.  (AR 60.)  She could not raise her upper

12   extremities above shoulder height and could not use her lower

13   extremities to push foot pedals.  (Id.)  She could occasionally

14   bend, stoop, and climb stairs.  (Id.)  She could not climb ropes,

15   ladders, or scaffolding or work at unprotected heights.  (Id.)

16      On April 8, 2014, the ALJ issued his decision, finding that

17   Plaintiff could perform a limited range of sedentary work.  (AR

18   113-29.)  Specifically, he found that because of her physical

19   limitations, Plaintiff could lift and carry 10 pounds

20   occasionally and less than that frequently, stand and walk for

21   two hours in an eight-hour day, sit for six hours in an eight-

22   hour day, and occasionally perform all posturals; she could not

23   use her upper extremities above shoulder level or her lower

24   extremities to operate foot pedals.  (AR 119.)  Plaintiff could

25   never climb, crawl, or work at heights or around dangerous moving

26   machinery or extreme heat or cold.  (Id.)  In so finding, the ALJ

27   accorded "great weight" to Dr. Ostrow's opinion (AR 121) and "no

28   weight" to Drs. Chiou's and Le's opinions (AR 123-24).

b. *Analysis*

As an initial matter, to the extent Plaintiff contends that the ALJ needed to provide "clear and convincing" reasons for rejecting Drs. Chiou's and Lin's opinions (see J. Stip at 13), she is incorrect.  Both of those opinions are controverted by Dr. Ostrow's testimony and by each other (compare AR 945 (Dr. Chiou stating that Plaintiff could sit "0-1" hour in eight-hour day), with AR 960 (Dr. Le stating that Plaintiff could sit four hours in eight-hour day)).  As such, the ALJ needed to set forth only specific and legitimate reasons for rejecting Drs. Chiou's and Le's opinions, see Carmickle, 533 F.3d at 1164, which he did.

The ALJ gave specific and legitimate reasons for discounting Dr. Chiou's opinions in the December 2011 letter and January 2012 fibromyalgia questionnaire.  As an initial matter, Dr. Chiou's December 2011 opinion that Plaintiff was permanently disabled was not binding on the ALJ or entitled to any special weight.  See § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); SSR 96-5p, 1996 WL 374183, at *5 (treating-source opinions that person is disabled or unable to work "can never be entitled to controlling weight or given special significance").  Moreover, as the ALJ noted, that opinion was simply an "extrapolation made from the data about back pain patients" and not based on the doctor's own observations of Plaintiff's symptoms.  (AR 124; see AR 930 (stating that Plaintiff was likely "permanently disabled" because studies of back-pain patients could be "extrapolated and applied to the fibromyalgia population").)

24

1    The ALJ also noted that at the time Dr. Chiou rendered his
2  opinions, he had been seeing Plaintiff for only four months.  (AR
3  124.)  As the ALJ found, given that short treatment history, Dr.
4  Chiou's opinions were "not based on objective observations of her
5  symptoms and their reaction to his recommended treatment
6  modalities over an extended period."  (Id.)  The ALJ was entitled
7  to consider Dr. Chiou's short relationship with Plaintiff when
8  weighing his opinion.  See § 404.1527(c)(2)(i).

9    The ALJ also found that Dr. Chiou's opinions were based
10 "primarily [on Plaintiff's] subjective complaints."  (AR 124.)
11 Indeed, as the ALJ noted (id.), Dr. Chiou started treating
12 Plaintiff in September 2011 but opined that her limitations had
13 existed since July 2009 — more than two years earlier — based
14 solely on Plaintiff's own report.[5]  (See AR 947 (stating
15 Plaintiff limitations began "per patient report July 2009").)
16 And Dr. Chiou's notes contain very few objective findings to
17 support his opinions.  For example, in his September 2011
18 treatment note, Dr. Chiou noted tenderness along the spine and
19 decreased range of motion in the lumbar spine, but full range of
20 motion in the cervical spine, a negative straight-leg test, "5/5

21

22    [5] Plaintiff cites several cases stating that a physician's
23 opinion cannot be disregarded solely because it was rendered
   retrospectively.  (See J. Stip. at 14 (citing Morgan, 169 F.3d at
24 601; Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988);
   Lesmeister v. Barnhart, 439 F. Supp. 2d 1023, 1030-31 (C.D. Cal.
25 2006)).)  But here, Dr. Chiou's opinion that Plaintiff's
   limitations began in 2009 was based solely on Plaintiff's
26 subjective complaints, not on his own observations, and in any
27 event, the ALJ did not discount the opinions "solely" on that
   basis — rather, he gave several specific and legitimate reasons
28 for doing so.

strength bilaterally in the upper and lower extremities," intact
nerves, intact sensation, and nonantalgic gait.  (AR 756-57; see
also AR 933 (Oct. 2011, noting decreased range of motion but 5/5
strength, intact sensation, and "not Antalgic" gait), 939 (Dec.
2011 (noting nerves grossly intact and "not Antalgic" gait).)
Dr. Chiou noted that a lumbar-spine MRI showed multilevel disc
bulges, stenosis, and facet hypertrophy but that a cervical-spine
MRI showed only mild disc protrusion at C5-C6 and her EMGs had
all been normal.  (AR 757.)  Given those generally mild
examination findings and test results, Dr. Chiou's opinions that
Plaintiff was totally disabled and suffered from extreme physical
limitations appear to have been based primarily on her
discredited subjective complaints.  See Tommasetti, 533 F.3d at
1041 (ALJ may reject treating physician's opinion if it is based
"on a claimant's self-reports that have been properly discounted
as incredible"); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th
Cir. 2001) (because record supported ALJ's discounting of
claimant's credibility, ALJ "was free to disregard [examining
physician's] opinion, which was premised on [claimant's]
subjective complaints"); cf. Thomas, 278 F.3d at 957 ("[t]he ALJ
need not accept the opinion of any physician, including a
treating physician, if that opinion is . . . inadequately
supported by clinical findings").

The ALJ also found that "little to no objective data"
supported Dr. Chiou's opinion that Plaintiff needed to miss more
than three days of work per month.  (AR 124.)  The ALJ noted that
Plaintiff's ability to "do[] activities daily, like walk[ing] her
children to school, shows she is able to get out daily and

perform routines on a schedule." (AR 123.)   Indeed, as discussed
in Section A, Plaintiff woke her young children and grandchild
each morning, prepared their meals, got them ready for school,
walked them to school, and supervised them.   Such activities
indicate that Plaintiff is capable of carrying out a regular work
routine.   Thus, this was also a specific and legitimate reason
for rejecting Dr. Chiou's opinion.   See Morgan, 169 F.3d at
601–02 (finding that inconsistency between treating physician's
opinion and claimant's daily activities was specific and
legitimate reason to discount opinion); § 404.1527(c)(4)
("Generally, the more consistent an opinion is with the record as
a whole, the more weight we will give to that opinion.").

    The ALJ also provided specific and legitimate reasons for
rejecting Dr. Le's opinion.   He noted that Dr. Le's finding that
Plaintiff would be required to get up and move around every 15
minutes (AR 960) conflicted with Plaintiff's own testimony that
she was able to sit for up to an hour at a time before she had to
get up and move around (AR 66-67).[6]   (AR 124.)   see Morgan, 169
F.3d at 601–02; § 404.1527(c)(4).   The ALJ also found that Dr.

---

[6] Plaintiff argues that her testimony was "quite different"
from what the ALJ stated in his opinion, primarily because she
testified that she felt pain when sitting longer than 30 to 45
minutes.   (J. Stip. at 16.)   It is true that Plaintiff testified
that she had low-back pain and could "start to feel it getting
worse" after sitting for "about a half an hour to 45 minutes."
(AR 66.)   But when asked, "[W]hen does it get to the point where
you have to get up and move around," Plaintiff answered, "The max
is about an hour."   (Id.)   After that, she testified, she had to
"get up and walk and stretch" for 10 to 15 minutes, or if she was
at home, she would "usually go and lay down."   (AR 66-67.)
Nothing in her testimony contradicts the ALJ's finding that
Plaintiff testified that she could sit for about an hour at a
time before needing to get up and move around.   (AR 124.)

27

Le's opinion that Plaintiff was unable to kneel or stoop
conflicted with the medical evidence showing that Plaintiff did
not have muscle weakness or numbness. (AR 124.) Indeed, Dr.
Le's own examination notes consistently showed that Plaintiff had
tender points and limited ranges of motion of the cervical and
lumbar spine but intact sensation and no muscle weakness (see,
e.g. AR 720 (Oct. 2011), 789 (Oct. 2011), 879 (Nov. 2011), 1054
(Feb. 2012), 1039 (Dec. 2012)), and he consistently recommended
low-impact cardiovascular exercise (see AR 721, 789, 879, 1037,
1052; see also AR 1049 (advising Plaintiff to "[r]estart pool
therapy).)[7]

Plaintiff argues that the ALJ erred in discounting Dr. Le's
opinion on this basis because factors other than weakness and
numbness could have limited her ability to stoop and bend. (J.
Stip. at 17.) But in his opinion, Dr. Le listed only four
"primary symptoms" that could have resulted in her functional
limitations: muscle and joint pain, "muscle weakness," "numbness
and tingling of extremities," and fatigue. (AR 958.) Given that
his own notes undermine half of those symptoms, the ALJ was not
unreasonable in finding that a total preclusion from stooping and
kneeling was unwarranted and discounting his opinion on that

---

[7] Dr. Le's opinion that Plaintiff could stand and walk only
"0-1" hours in an eight-hour day (AR 960) appears to conflict
with his consistent recommendations that Plaintiff exercise.
Moreover, in assessing the opinion of another of Plaintiff's
treating physicians, Dr. Zahiri, the ALJ noted that Plaintiff's
ability to walk her children to and from school, along with her
other daily activities, indicated that she is able to stand and
walk for two hours a day. (AR 123.) And as noted, Plaintiff
herself told Dr. Sams as late as 2014 that she was on her feet
four hours out of 16. (AR 1059.)

basis.   Indeed, Plaintiff herself stated that she was unable to kneel only "for long periods due to numbness in my legs."  (AR 465.)[8]

The ALJ also found that Dr. Le's opinion that Plaintiff would miss more than three days of work a month conflicted with Plaintiff's account of her daily activities, which as discussed above, showed she was able to get her young children and grandchild to school and back each day and supervise them when they were home.  (AR 124.)  The ALJ therefore provided specific and legitimate reasons for rejecting Dr. Le's opinion.

Finally, the ALJ was entitled to rely on the opinion of Dr. Ostrow, the medical expert who testified at the second hearing, instead of Drs. Chiou's and Le's.  (See AR 121.)  The ALJ found that Dr. Ostrow's opinion was "supported by and consistent with the full objective medical evidence of record."  (Id.)  For example, the ALJ noted that Plaintiff's EMG was negative and her motor strength and sensation were generally normal when tested, and thus she "does not have limitations on her ability to perform the manipulative work activities such as gross or fine manipulation."  (AR 120.)  He found that, as Dr. Ostrow had recommended, "she should limit the use of her arms above shoulder level as this type of activity can increase her neck and upper

---

[8] Consistent with Plaintiff's complaints (AR 464-65) and Dr. Ostrow's opinion (AR 60), the ALJ recognized that Plaintiff did not have a full ability to stoop and kneel, because he limited Plaintiff's performance of "posturals" — which included stooping and kneeling — to occasional.  (AR 119); see § 404.1569a(c)(1)(vi) (noting that "manipulative or postural functions" include activities such as "reaching, handling, stooping, climbing, crawling, or crouching").

back pain symptoms." (_Id._) The ALJ also found, consistent with Dr. Ostrow's opinion, that Plaintiff should avoid using foot pedals because that could exacerbate her lumbar-spine degeneration; that crawling and climbing would likely exacerbate her fibromyalgia symptoms by increasing pressure on her knees and low back; and that she should avoid working at heights because her pain medication could affect her concentration. (AR 121.) The ALJ also noted that Dr. Ostrow reviewed the majority of the medical evidence, testified at the hearing, and was familiar with the agency's policy and regulations. (AR 121.) As such, the ALJ was entitled to rely on Dr. Ostrow's opinion. _See_ _Thomas_, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); _Morgan_, 169 F.3d at 600 ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it" (citing _Andrews v. Shalala_, 53 F.3d 1035, 1041 (9th Cir. 1995))); _Andrews_, 53 F.3d at 1042 (greater weight may be given to nonexamining doctors who are subject to cross-examination); _see_ § 405.1527(c)(4) (ALJ will generally give more weight to opinions that are "more consistent . . . with the record as a whole"); § 404.1527(c)(6) (in weighing medical opinions, ALJ may consider "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has" and "the extent to which an acceptable medical source is familiar with the other information in your case record").

1      Reversal is not warranted on this ground.

2           4.   Mental Impairments

3                a.   *Relevant background*

4      On July 24, 2010, Dr. Katrine Enrile, a physician, performed

5 a complete psychiatric evaluation of Plaintiff.[9]  (AR 646-50.)

6 Plaintiff reported that since her son had been killed in a car

7 accident, in 2007, she had suffered from severe insomnia, chronic

8 fatigue, anxiety, depression, poor concentration, and poor

9 appetite.  (AR 646-47.)  She was not, however, receiving any

10 psychiatric treatment.  (AR 647.)

11     Upon examination, Dr. Enrile found that Plaintiff was

12 cooperative, had good eye contact, and was able to establish

13 rapport with the doctor.  (AR 648.)  Her speech was normal, her

14 mood "cheerful," and her affect sad, anxious, subdued,

15 constricted, and fearful.  (Id.)  Her thought processes were

16 linear and goal directed, and her thought content was normal

17 except for ruminations about her son's death.  (Id.)  She could

18 recall three of three words, perform serial sevens and simple

19 calculations, and correctly spell the word "world" forward and

20 backward.  (Id.)  She could name the past and present President

21 of the United States and the capitals of California and the

22 United States.  (AR 649.)

23     Dr. Enrile diagnosed post-traumatic stress disorder and

24

25      [9] Dr. Enrile did not state in her report whether she had any
area of specialization, but the California Medical Board's
26 license-verification website shows that she reports being board-
certified in psychiatry.  See Med. Bd. of Cal., BreEZe Online
27 License Verification, http://www.mbc.ca.gov/Breeze/
License_Verification.aspx (last accessed Jan. 27, 2016) (search
28 for Enrile, Katrine).

"[r]ule out Complicated Grieving process versus Depressive Disorder" and assigned a global assessment of functioning ("GAF") score of 55.[10]   (AR 649.)   She believed Plaintiff's work functioning would be "adequate": her ability to focus attention and follow simple oral and written instructions was "not limited," and she could perform detailed and complex tasks, maintain regular attendance, perform work consistently, accept instructions from supervisors, interact with coworkers and the public, and deal with the stressors of competitive employment. (Id.)   Dr. Enrile believed that given the appropriate treatment, Plaintiff's condition would likely improve within 12 months. (Id.)

Dr. Sams, a psychologist, first treated Plaintiff on January 4, 2012.   (AR 952.)   He found that Plaintiff displayed mild pain behavior, ambulated independently, was alert and oriented, and did not have hallucinations or delusions.   (Id.)   Her speech was normal and goal directed.   (Id.)   Her mood was dysphoric and her affect constricted.   (Id.)   There was no report or evidence of cognitive impairment, and she had good insight and judgment.

---

[10] Previous editions of the Diagnostic and Statistical Manual of Mental Disorders stated that a GAF score of 51 to 60 indicated moderate symptoms or difficulty in social, occupational, or school functioning.   See Diagnostic and Statistical Manual of Mental Disorders 34 (revised 4th ed. 2000). But the Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pts. 404 and 416) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice.   Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

(<u>Id.</u>)  Dr. Sams noted that Plaintiff's psychological testing indicated severe depression, moderate anxiety, mild hopelessness, severe disability, and severe suffering.  (<u>Id.</u>)  He recommended that her medical doctor prescribe Zoloft and that Plaintiff complete eight sessions of biofeedback and eight sessions of individual psychiatric treatment.  (<u>Id.</u>)

Dr. Sams saw Plaintiff for follow-up treatment on February 1, June 29, and September 7 and 14, 2012 (AR 1009-14), and June 7, 20, and 21, August 1, and September 25 and 26, 2013 (AR 1015-19).  In the June 20, 2013 treatment note, Dr. Sams noted that Plaintiff "feels trapped in her house with her sons (11, 6) with no car," had "severe financial problems," and "wants to go to school in mornings beginning in the fall, but her husband is also returning to school."  (AR 1016.)  In the June 21, 2013 note, Dr. Sams noted that Plaintiff had received prescriptions for Zoloft and Buspar and would start taking them that day.  (AR 1017.)

On January 30, 2014, Dr. Sams completed a Disability Evaluation of Mental Disorder.  (AR 1057-62.)  He noted that Plaintiff ambulated without assistance, demonstrated "mild pain behavior," and was generally cooperative, with good hygiene and eye contact.  (AR 1057.)  She reported a "continual history of depression since 2007."  (<u>Id.</u>)  Plaintiff had a good relationship with her extended family and visited friends or family monthly.  (AR 1058.)

Upon examination, Dr. Sams found that Plaintiff was alert and oriented, pleasant and cooperative, and appeared restless.  (<u>Id.</u>)  Her speech was spontaneous, goal directed, and "normal with respect to rhythm and syntax, but retarded in rate."  (<u>Id.</u>)

Attention, concentration, and short-term memory were moderately impaired.  (Id.)  Long-term memory and verbal reasoning were normal, her intelligence was average, and insight and judgment were good.  (Id.)

Plaintiff reported that her daily activities included "[u]p at 6:30 am, kids off to school, spend much of the day resting, doing light chores, time with family or in my room, to bed at 9:30."  (AR 1059.)  She spent "3/16 waking hours being productive" and "4/16 waking hours on her feet."  (Id.)

Dr. Sams diagnosed post-traumatic stress disorder, complicated bereavement, and anxiety disorder and assigned a GAF score of 58.  (AR 1062.)  He opined that Plaintiff had no impairment in her ability to remember locations and worklike procedures, sustain an ordinary routine, work in coordination with others, interact with the general public, ask simple questions or request assistance, get along with coworkers, maintain social appropriate behavior, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions.  (AR 1059-61.)  She was mildly impaired — which was defined as "not preclud[ing] function" — in her ability to understand and remember very short and simple instructions, carry out detailed instructions, and accept instructions and respond appropriately to criticism from supervisors.  (Id.)  She was moderately impaired — which was also defined as "not preclud[ing] function" —  in her ability to make simple work-related decisions and travel in unfamiliar places.  (Id.)  She was "severe[ly] impaired" – which was defined as "preclud[ing] function" – in her ability to understand and

34

remember detailed instructions, maintain attention and
concentration for extended periods, perform activities within a
schedule, maintain regular attendance and be punctual, complete a
normal workday without interruption from psychological symptoms
and perform at a consistent pace without an unreasonable number
of rest periods, and set realistic goals or make plans
independently of others.  (Id.)  Dr. Sams believed that
Plaintiff's prognosis was poor and her psychological status was
unlikely to improve.  (AR 1062.)

In his April 8, 2014 decision, the ALJ found that because of
her mental impairments, Plaintiff could perform only "simple
tasks, that are in an object-oriented environment," which would
"exclude work with the general public."  (AR 121; see also AR
119.)  In so finding, the ALJ found that Dr. Enrile's assessment
of Plaintiff's limitations was "slightly higher than what [she]
is actually capable of given the combination of her mental
impairments," and thus he accorded it "some but not full weight."
(AR 125.)  He likewise accorded "only some weight" to Dr. Sams's
opinion.  (AR 126.)

b.  *Analysis*

As an initial matter, the ALJ credited and accommodated most
of Dr. Sams's findings when formulating Plaintiff's RFC.  (AR 125
(finding that Dr. Sams's opinion was "generally consistent with"
Plaintiff's RFC).)  The ALJ noted that Dr. Sams found that
Plaintiff would be precluded from understanding and remembering
detailed instructions, maintaining attention and concentration
for extended periods, performing activities within a schedule,
maintaining regular attendance, being punctual, completing a

normal workday and workweek without interruption from psychological symptoms, performing at a consistent pace, and setting realistic goals and making plans independently of others. (AR 125.)   The ALJ accommodated most of those findings by limiting Plaintiff to performing only simple tasks in an "object-oriented" and nonpublic environment, noting that the "ability to avoid the public would enable [Plaintiff] to focus on her job task while avoiding the distractions that public interaction brings."  (AR 125 (finding Dr. Sams's opinion was "generally consistent" with RFC).)   Indeed, Plaintiff's RFC appears consistent with Dr. Sams's findings that Plaintiff was only "mildly" limited in her ability to understand and remember very short and simple instructions and carry out detailed instructions and had no significant limitations on her ability to carry out an ordinary routine, remember locations and work-like procedures, and work around coworkers and supervisors.  (See AR 1059-61.)[11] Indeed, as discussed below in Section C, the ALJ ultimately found that Plaintiff could perform two sedentary jobs that involved only one- and two-step instructions.  (AR 128.)

    To the extent the ALJ rejected some of Dr. Sams's findings, he gave specific and legitimate reasons for doing so.  Dr. Sams found that Plaintiff would be unable to perform activities on a schedule, maintain regular attendance, be punctual, or complete a

---

    [11] Dr. Sams's opinion that Plaintiff was significantly limited in her ability to concentrate, remember, and carry out tasks appears to conflict with findings in his treatment notes that Plaintiff had no cognitive impairment.  (See AR 952 (Jan. 2012, no evidence of cognitive impairment), 1015 (June 2013, noting "[t]here is not evidence of cognitive impairment").)

1   normal workday or workweek without interruption from

2   psychological symptoms, but the ALJ found that Plaintiff

3   "demonstrated through her statements about her daily routine and

4   the care of her young children that she can be somewhere in the

5   morning regularly and on time." (AR 126.)  The ALJ was entitled

6   to discount Dr. Sams's opinion because it was "not fully

7   supported by [Plaintiff's] own statements." (Id.); see Morgan,

8   169 F.3d at 601-02; § 404.1527(c)(4).

9        The ALJ was also entitled to rely on Dr. Enrile's findings

10  instead of some of Dr. Sams's.  Dr. Enrile's opinion constituted

11  substantial evidence supporting the RFC assessment because it was

12  based on her own independent clinical findings.  See Tonapetyan,

13  242 F.3d at 1149 (finding that examining physician's "opinion

14  alone constitutes substantial evidence" supporting RFC assessment

15  "because it rests on his own independent examination of"

16  claimant); Andrews, 53 F.3d at 1041 (when "opinion of a

17  nontreating source is based on independent clinical findings," it

18  "may itself be substantial evidence").  Dr. Enrile also

19  apparently reviewed at least some of Plaintiff's psychiatric

20  records. (AR 647 (stating that "a psychiatric record" was

21  "available for review")); § 404.1527(c)(3) (in weighing medical

22  opinions, ALJ "will evaluate the degree to which these opinions

23  consider all of the pertinent evidence in [claimant's] claim").

24  Thus, any conflict in the properly supported medical-opinion

25  evidence was "solely the province of the ALJ to resolve." 

26  Andrews, 53 F.3d at 1041.

27       Reversal is not warranted on this ground.

28

1      C.   <u>The ALJ Did Err In Relying on the VE testimony</u>

2      Plaintiff contends that the ALJ should not have relied on

3 the VE's testimony that she could perform certain jobs because

4 they required frequent or constant reaching, which allegedly

5 conflicted with her RFC precluding her from using her arms above

6 shoulder level.  (J. Stip. at 52-53.)

7      1.   <u>Applicable law</u>

8     At step five of the five-step process, the Commissioner has

9 the burden to demonstrate that the claimant can perform some work

10 that exists in "significant numbers" in the national or regional

11 economy, taking into account the claimant's RFC, age, education,

12 and work experience.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th

13 Cir. 1999); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c).

14 The Commissioner may satisfy that burden either through the

15 testimony of a vocational expert or by reference to the Medical-

16 Vocational Guidelines appearing in 20 C.F.R. part 404, subpart P,

17 appendix 2.  <u>Tackett</u>, 180 F.3d at 1100-01; <u>see also</u> <u>Hill v.</u>

18 <u>Astrue</u>, 698 F.3d 1153, 1161 (9th Cir. 2012).  When a VE provides

19 evidence about the requirements of a job, the ALJ has a

20 responsibility to ask about "any possible conflict" between that

21 evidence and the DOT.  <u>See</u> SSR 00-4p, 2000 WL 1898704, at *4;

22 <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-54 (9th Cir. 2007)

23 (holding that application of SSR 00-4p is mandatory).  When such

24 a conflict exists, the ALJ may accept vocational expert testimony

25 that contradicts the DOT only if the record contains "persuasive

26 evidence to support the deviation."  <u>Pinto</u>, 249 F.3d at 846

27 (citing <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995));

28 <u>see also</u> <u>Tommasetti</u>, 533 F.3d at 1042 (finding error when "ALJ

1   did not identify what aspect of the VE's experience warranted
2   deviation from the DOT").

3          2.   Relevant background

4          At the February 2014 hearing, the ALJ asked the VE whether a
5   person with Plaintiff's RFC, which included "[n]o use of the
6   upper extremities above shoulder level bilaterally," could
7   perform jobs existing in the local or national economy.  (AR 75-
8   76.)  The VE responded that such a person could perform two
9   "assembler" jobs, DOT 734.687-018 and DOT 713.687-018.  (AR 76.)
10  Plaintiff's counsel then cross-examined the VE, but he did not
11  question her about those jobs, Plaintiff's reaching limitations,
12  or any potential conflict with the DOT.  (AR 77-78.)  At the end
13  of the hearing, the ALJ asked the VE, "has your testimony been
14  consistent with the Dictionary of Occupational Titles, and its
15  companion publications?"  (AR 78.)  She responded, "It has been."
16  (Id.)

17         In his April 2014 decision, the ALJ relied on the VE's
18  testimony to find that Plaintiff could perform the two assembler
19  jobs, noting that "[p]ursuant to SSR 00-4p, the undersigned has
20  determined that the [VE's] testimony is consistent with the
21  information contained in the [DOT]."  (AR 128.)  Accordingly, he
22  determined that Plaintiff was not disabled.  (AR 128-29.)

23         3.   Analysis

24         According to the DOT, the first assembler job identified by
25  the VE is titled "Assembler" and requires "constant" reaching,
26  DOT 734.687-018, 1991 WL 679950, and the second is titled "Final
27  Assembler" and requires "frequent" reaching, DOT 713.687-018,
28  1991 WL 679271.  Plaintiff argues that because she is unable to

use her arms above shoulder level and reaching can involve

extending her arms in "any direction," an unresolved conflict

exists between the VE's testimony and the DOT description of the

assembler jobs.  (J. Stip. at 52-53.)  For several reasons,

Plaintiff's argument fails.

As an initial matter, the ALJ fulfilled his "affirmative

responsibility to ask about any possible conflict between [the

VE] evidence and information provided in the DOT," SSR 00-4P,

2000 WL 1898704 at *4, by eliciting the VE's affirmation that her

testimony was consistent with the DOT (see AR 78).  Moreover, no

apparent or actual conflict exists between Plaintiff's inability

to use her arms above shoulder level and the assembler jobs'

requirement of constant or frequent reaching.  It is true that

the DOT's companion publication and the agency have generally

defined "reaching" as "extending the hands and arms in any

direction."  SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985); U.S.

Dep't of Labor, Emp't & Training Admin., Selected Characteristics

of Occupations Defined in the Revised Dictionary of Occupational

Titles, app. C (1993) (defining reaching as "[e]xtending hand(s)

and arm(s) in any direction").  But just because the term

"reaching" includes extending the arms in "any" direction — such

as up, down, out, right, and left — that does not mean that a job

that involves reaching necessarily requires extending the arms in

all of those directions.  See Frias v. Colvin, No. CV

15-02185-JEM, 2015 WL 8492453, at *7 (C.D. Cal. Dec. 10, 2015)

(rejecting plaintiff's assertion that DOT description for

frequent reaching conflicted with RFC for only occasional

overhead reaching because "[r]eaching need not always include

40

overhead reaching"); <u>Rodriguez v. Astrue</u>, No. CV 07-2152 PJW, 2008 WL 2561961, at *2 (C.D. Cal. June 25, 2008) ("The fact that 'reaching' as a general matter can involve 'extending hand(s) or arm(s) in any direction' does not mean that the reaching required for the jobs identified by the vocational expert in this case involves reaching at or above shoulder-level.").

The DOT descriptions of the two assembler jobs, moreover, show that they do not in fact require use of the arms above the shoulder.  Both jobs require only one or two steps: the "Assembler" job involves "[i]nsert[ing] paper label in back of celluloid or metal advertising buttons and forc[ing] shaped stickpin under rim," DOT 734.687-018, 1991 WL 679950, and the "Final Assembler" job involves "[a]ttach[ing] nose pads and temple pieces to optical frames, using handtools," "position[ing] parts in fixture to align screw holes," and "[i]nsert[ing] and tighten[ing] screws, using screwdriver," DOT 713.687-018.  Thus, any reaching required by those jobs presumably would be forward and down, in order to pick up parts and tools from a desk or table before assembly.  Nothing in those descriptions of tasks indicates that Plaintiff would need to use her arms above shoulder level.  Thus, the VE's testimony that Plaintiff could perform those jobs does not conflict with the DOT.  <u>See</u> <u>Frias</u>, 2015 WL 8492453, at *7 (finding that because "the DOT does not discuss overhead reaching, there is no conflict between the DOT and the ALJ's RFC limitation" on overhead work); <u>Martinez v. Colvin</u>, No. 1:14-CV-1070-SMS, 2015 WL 5231973, at *4 (E.D. Cal. Sept. 8, 2015) (finding no conflict between VE testimony that plaintiff could perform three jobs, including Final Assembler,

and plaintiff's preclusion from overhead reaching because "[i]t is clear that the reaching required to perform these occupations is not overhead, and is consistent with [p]laintiff's RFC").

Plaintiff cites several unpublished district court cases that found a conflict between frequent reaching and a preclusion or restriction on reaching above the shoulder level. (See J. Stip. at 52-53.) She recognizes, however, that "authority in this district is split" and cites cases that found no conflict in similar circumstances. (Id.) In any event, unpublished district court cases are not binding on this Court, and to the extent they conflict with this opinion, the Court declines to follow them.

Finally, Plaintiff's argument is not well-taken because her attorney cross-examined the VE at the administrative hearing but neglected to question her about any conflicts with the DOT. See Solorzano v. Astrue, No. ED CV 11-369-PJW, 2012 WL 84527, at *6 (C.D. Cal. Jan. 10, 2012) ("Counsel are not supposed to be potted plants at administrative hearings . . . [t]hey have an obligation to take an active role and to raise issues that may impact the ALJ's decision while the hearing is proceeding so that they can be addressed"). The ALJ was therefore entitled to rely on the VE's testimony that a person who could not use her arms above shoulder level could perform the two assembler jobs. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (holding that VE's recognized expertise provides necessary foundation for her testimony).

Remand is not warranted on this ground.

**VI.    CONCLUSION**

Consistent with the foregoing, and under sentence four of 42 U.S.C. § 405(g),[12] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice. IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: January 29, 2016        JEAN ROSENBLUTH
                               JEAN ROSENBLUTH
                               U.S. Magistrate Judge

---

[12] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."